2023 WL 1830446
Only the Westlaw citation is currently available.
United States Court of Appeals, Tenth Circuit.

Robert HARRISON, on behalf of himself, the Envision Management Holding, Inc. ESOP, and all other similarly situated individuals, Plaintiff - Appellee,
v.
ENVISION MANAGEMENT HOLDING, INC. BOARD OF DIRECTORS; Envision Management Holding, Inc. Employee Stock Ownership Plan Committee; Argent Trust Company; Darrel Creps, III; Paul Sherwood; Jeff Jones; Aaron Ramsay; Tanweer Kahn, Defendants - Appellants.
Chamber of Commerce of the United States of America; the ESOP Association; Secretary of the United States Department of Labor; Public Justice, Amici Curiae.

No. 22-1098
|
FILED February 9, 2023

**Synopsis**
**Background:** Participant in corporation's employee stock ownership plan (ESOP) filed a purported class action against corporation and its officers, alleging financial misconduct in violation of the Employee Retirement, Income Security Act (ERISA). The United States District Court for the District of Colorado, Regina M. Rodriguez, J., 593 F.Supp.3d 1078, denied defendants' motion to compel arbitration. Defendants appealed.

**Holdings:** The Court of Appeals, Briscoe, Circuit Judge, held that:

arbitration provision in corporation's ESOP prevented participant from effectively vindicating his right to pursue plan-wide remedies under ERISA and thus was invalid, and

remedies limitation in arbitration could not be severed from arbitration provision.

Affirmed.

**Procedural Posture(s):** On Appeal; Motion to Compel Arbitration.

**Appeal from the United States District Court for the District of Colorado (D.C. No. 1:21-CV-00304-RMR-NYW)**

**Attorneys and Law Firms**

Barbara A. Smith, Bryan Cave Leighton Paisner LLP, Denver, Colorado (Michael J. Hoffman, Bryan Cave Leighton Paisner LLP, Denver, Colorado; and Lars C. Golumbic, William J. Delaney, and Paul J. Rinefierd, Groom Law Group, Washington, DC, with her on the briefs), appearing for Appellants.

John Stokes, Stris & Maher LLP, Los Angeles, California (Peter K. Stris and Rachana A. Pathak, Stris & Maher LLP, Los Angeles, California; and Michelle C. Yau, Kai H. Richter, Mary J. Bortscheller, and Ryan A. Wheeler, Cohen Milstein Sellers & Toll PLLC, Washington, DC, with him on the brief), appearing for Appellees.

Brendan Ballard, Senior Trial Attorney, Plan Benefits Security Division (Seema Nanda, Solicitor of Labor, G. William Scott, Associate Solicitor for Plan Benefits Security, and Jeffrey M. Hahn, Counsel for Appellate and Special Litigation, with her on the brief), United States Department of Labor, Office of the Solicitor, Washington, DC, appearing for Amicus Curiae United States Secretary of Labor in support of Appellees.

Jennifer B. Dickey, United States Chamber Litigation Center, Washington, DC; Andrew J. Pincus, Archis A. Parasharami, Daniel E. Jones, and Eric A. White, Mayer Brown LLP, Washington, DC; and Nancy G. Ross, Jed W. Glickstein, Mayer Brown LLP, Chicago, Illinois, filed an Amicus Curiae brief on behalf of the Chamber of Commerce of the United States in support of Appellants.

Richard J. Pearl, Faegre Drinker Biddle & Reath LLP, Chicago, Illinois, and Mark D. Taticchi, Faegre Drinker Biddle & Reath LLP, Philadelphia, PA, filed an Amicus

Curiae brief on behalf of Esop Association in support of Appellants.

Jeffrey B. Dubner, Democracy Forward Foundation, Washington, DC, and Leah M. Nicholls, Public Justice, Washington, DC, filed an Amicus Curiae brief on behalf of Public Justice in support of Appellees.

Before BACHARACH, BRISCOE, and MURPHY, Circuit Judges.

**Opinion**

BRISCOE, Circuit Judge.

***1** Plaintiff Robert Harrison, a participant in a defined contribution retirement plan established by his former employer, filed suit under the Employee Retirement Income Security Act (ERISA) against the fiduciaries of the plan alleging that they breached their duties towards, and caused damages to, the plan. Harrison's complaint sought various forms of relief, including a declaration that Defendants breached their fiduciary duties, the removal of the current plan trustee, the appointment of a new fiduciary to manage the plan, an order directing the current trustee to restore all losses to the plan that resulted from the fiduciary breaches, and an order directing Defendants to disgorge the profits they obtained from their fiduciary breaches. In response, Defendants moved to compel arbitration, citing a provision of the plan document. The district court denied that motion, concluding that enforcing the arbitration provision of the plan would prevent Harrison from effectively vindicating the statutory remedies sought in his complaint. Defendants now appeal from that ruling. Exercising jurisdiction pursuant to 28 U.S.C. § 1291, we affirm the district court's decision.

I

*Factual history*

Defendant Envision Management Holding, Inc. (Envision) is a privately-owned shell corporation, based in Colorado Springs, Colorado, that was founded in approximately 2000 by defendants Darrel Creps II, Paul Sherwood, and Jeff Jones (collectively the Seller Defendants). Envision owns Envision Management, LLC, which provides diagnostic imaging services in several states, including Colorado, Oklahoma, Louisiana, and Texas. Envision and Envision Management, LLC collectively employ approximately 1,000 individuals.

Envision had in place a Board of Directors (the Board). The Seller Defendants were members of the Board, as were defendants Aaron Ramsay and Tanweer Kahn.

Plaintiff Harrison, who is a resident of Colorado, was employed by Envision for approximately four years between 2016 and August 2020. Harrison left his employment with Envision in August 2020.

In 2017, the Seller Defendants created the Envision Employee Stock Ownership Plan (the ESOP). The ESOP is an ERISA-protected, defined contribution plan under which the employer makes contributions on behalf of employee-participants and the contributions are invested in the employer's stock.[1] Under the terms of the Plan Document that governed the ESOP, "each Eligible Employee ... bec[a]me a Participant" of the ESOP "as of the date the Eligible Employee first perform[ed] an Hour of Service in 2017." Aplt. App., Vol. I at 85. Because Harrison worked for Envision in 2017 and, under the terms of the Plan Document, qualified as an "Eligible Employee," he automatically became a plan participant. By December 31, 2019, Harrison had three years of service in the ESOP which, under the terms of the Plan Document, meant that he was 40% vested.

[1] "A defined contribution plan allows the employee or the employer (or both) to contribute to the employee's individual account (e.g., a 401(k) plan). By contrast, a defined benefit plan provides a fixed monthly benefit based on a general pool of assets (e.g., a pension plan)." Smith v. Bd. of Directors of Triad Mfg., Inc., 13 F.4th 613, 615 (7th Cir. 2021).

***2** Envision was the primary sponsor of the ESOP. The ESOP was administered and managed by the Envision Management Holding, Inc. Employee Stock Ownership Plan Committee (ESOP Committee). Harrison alleges that at all relevant periods, the ESOP Committee's members included the Seller Defendants and other unidentified individuals. Under the terms of the Plan Document, the named fiduciaries to the ESOP included the ESOP Committee (both in its own capacity

and as plan administrator), the Board, the named trustee to the ESOP, and the ESOP's investment manager.

Harrison alleges that the Seller Defendants created the ESOP so that the ESOP could purchase 100% of the Seller Defendants' private Envision stock for $163.7 million (the ESOP Transaction). Harrison further alleges that the Seller Defendants selected Argent Trust Company (Argent) to serve as Trustee of the ESOP. Harrison alleges that, even though the sale occurred, the Seller Defendants retained control over both Argent and the ESOP by (a) receiving assurance from Argent that they would remain on the Board, (b) granting themselves the right to unilaterally fire Argent from its role as Trustee of the ESOP in the event that Argent did not carry out their directions, and (c) exculpating Argent from liability stemming from the ESOP Transaction, with any damages to be paid from Envision's corporate assets.

Harrison alleges that the ESOP did not have enough money to complete the ESOP Transaction and, as a result, borrowed $103,537,461 directly from the Seller Defendants, as well as $50,822,524 from the company itself, in order to purchase the Seller Defendants' stock. Harrison alleges that the Seller Defendants charged an interest rate of approximately 12% for the loan they gave to the ESOP.

The ESOP Transaction, which was approved by Argent, allegedly required the ESOP to pay two different share prices for the same Envision stock. Approximately 63,807 shares were purchased by the ESOP for a price of $1,770 per share. According to Harrison, the ESOP used cash to pay for 5,311 of those 63,807 shares, and in turn used the $103,537,471 loan from the Seller Defendants to purchase the remaining 58,496 of those 63,807 shares. The ESOP also allegedly purchased approximately 36,194.52 shares of stock for $1,404 per share and used the $50,822,524 loan from Envision to make this purchase.

Harrison alleges that "[t]here is no clear reason why the ESOP would pay two different prices for the same stock, particularly when the Articles of Incorporation for Envision ... indicate that there is only one class of common stock which has the same par value." *Id*. at 32. Harrison also alleges "that on December 31, 2017—just a few weeks after the ESOP" purchased the stock—"all 100,000 shares the ESOP bought were independently valued at $349 per share." *Id*. Further,

Harrison alleges that, following the stock purchase, the retirement contributions that Envision made to the ESOP's employee-participants' accounts were used to first pay the interest due on the $154.4 million in debt the ESOP owed.

In sum, Harrison alleges that the Seller Defendants, with the effective assistance of Argent, were able to financially benefit by selling Envision to the ESOP for significantly more than it was worth, while at the same time leaving the ESOP with a $154.4 million debt. Harrison further alleges that the Seller Defendants, notwithstanding the sale, were able, with the assistance of Argent, to retain control of Envision.

*Procedural history*

On January 29, 2021, Harrison initiated these proceedings by filing a complaint in the United States District Court for the District of Colorado against Envision, Envision's Board of Directors (the Board), the ESOP Committee, Argent, the Seller Defendants, Aaron Ramsay (a Board member), Tanweer Kahn (a Board member), and John and Jane Does 1 to 15. The complaint alleges generally that Harrison's claims are brought pursuant to ERISA and are "seeking plan-wide relief on behalf of the" ESOP. *Id.* at 13. In support, the complaint alleges that the ESOP Transaction "caused Plaintiff and all other ESOP participants to suffer significant losses to their ESOP retirement savings." *Id*. at 18. The complaint alleges six specific causes of action arising under various provisions of ERISA.

**\*3** On May 10, 2021, Defendants filed a motion to compel arbitration and to stay the proceedings. In support, Defendants argued that Section 21 of the Plan Document, entitled "ERISA ARBITRATION AND CLASS ACTION WAIVER," "require[d] arbitration of" Harrison's claims and that Harrison, "[b]y filing his complaint in federal court," was "seek[ing] to circumvent two federal laws—the Federal Arbitration Act [(FAA) ..., which mandates enforcing arbitration provisions, and ERISA, which dictates enforcing the terms of governing plan documents." *Id*. at 55. Defendants asserted that the district court "should compel Plaintiff to arbitrate all of his claims on an individual basis pursuant to the FAA, and either stay th[e] lawsuit or, in the alternative, dismiss the case (and close it administratively) under Rule 12(b)(1)." *Id*. at 56. Defendants also asked the district court to award them "their

attorneys' fees and costs incurred in seeking this relief." *Id*. at 69.

Harrison filed a memorandum in opposition to Defendants' motion to compel arbitration and to stay the proceedings. Harrison argued that Defendants were "ask[ing] the Court to endorse a severe limitation of the substantive relief Congress made available to [him] under ERISA, including his right to seek relief on behalf of the Plan as a whole," and that "[n]either the Federal Arbitration Act ... nor ERISA permit[ted] that result." *Id*. at 136–37. Harrison noted that "[t]he statutory rights at issue derive[d] from ERISA § 502(a)(2), which gives a participant the right to sue 'for appropriate relief under section 1109 of this title.' " *Id*. at 140 (quoting 29 U.S.C. § 1132(a)(2)). "Section 1109," Harrison noted, "expressly authorizes removal of a breaching fiduciary and any 'such other equitable or remedial relief as the court may deem appropriate.' " *Id*. at 140–41 (quoting 29 U.S.C. § 1109(a)). "Simply put," Harrison argued, "§ 502(a)(2) is a unique provision of ERISA that allows plan participants to sue plan fiduciaries and recover *all* losses suffered by *all* plan participants, not only individual losses." *Id*. (emphasis in original). Harrison argued that "[t]he arbitration provision here cannot be enforced because it would strip [him] of substantive rights conferred by ERISA: namely, the right to proceed under § 1132(a)(2) and seek multiple remedies on behalf of the Plan as a whole."[2] *Id*. at 141.

[2] Harrison also argued that "[t]he Court should deny Defendants' motion for the further reason that [he] did not consent to arbitrate his fiduciary breach claims," and in fact "had no notice of the arbitration provision." Aplt. App., Vol. I at 137. Harrison noted in support that he was "never given" a copy of the Plan Document "during his employment with Envision," and that, "[i]nstead, participants only received the Summary Plan Description ('SPD') which advised that ESOP participants could file fiduciary breach claims in federal court but *said nothing about arbitration*." *Id*. (emphasis in original).

On March 24, 2022, the district court issued an order denying defendants' motion to compel arbitration and to stay. The district court concluded, in pertinent part, that "the arbitration provision in the Plan [wa]s invalid because it conflicts with ERISA." *Id*. at 179. More specifically, the district court, invoking what is known as the effective vindication exception, concluded "that the arbitration provision acts as a prospective waiver" of Harrison's right to pursue statutory remedies under ERISA "because it disallows plan-wide relief, which is expressly contemplated by [sections 1132(a)(2) and 1109 of] ERISA." *Id*. at 180.

Defendants filed a notice of appeal on April 4, 2022.

II

Defendants argue in their appeal that the district court erred in denying their motion to compel arbitration. In particular, Defendants argue that the district court's order circumvented the FAA by invoking the effective vindication exception to invalidate the arbitration provisions of the Plan Document, which otherwise required Harrison to individually arbitrate his ERISA claims. For the reasons that follow, we reject Defendants' arguments and conclude that the district court properly invoked the effective vindication exception to invalidate the arbitration provisions of the Plan Document.

*Standard of review*

**\*4** "We review a district court's denial of a motion to compel arbitration de novo and apply the same legal standard as the district court." *Ragab v. Howard*, 841 F.3d 1134, 1136 (10th Cir. 2016).

*Arbitration agreements – general validity*

The FAA was "enacted in 1925 as a response to judicial hostility to arbitration." *CompuCredit Corp. v. Greenwood*, 565 U.S. 95, 97, 132 S.Ct. 665, 181 L.Ed.2d 586 (2012). The FAA provides, in relevant part:

> A written provision in any maritime transaction or a contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction ... shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract.

9 U.S.C. § 2. "The Supreme Court has long recognized and enforced" § 2 of the FAA as "a liberal federal policy favoring arbitration agreements." *Ragab*, 841 F.3d at 1137 (internal quotation marks omitted) (citing *Howsam v. Dean Witter Reynolds, Inc.*, 537 U.S. 79, 83, 123 S.Ct. 588, 154 L.Ed.2d 491 (2002)). "Therefore, all doubts must be resolved in favor of arbitration." *Id.* at 1136 (internal quotation marks omitted). "That is the case even when the claims at issue are federal statutory claims, unless the FAA's mandate has been 'overridden by a contrary congressional command.' " *CompuCredit*, 565 U.S. at 98, 132 S.Ct. 665 (quoting *Shearson/Am. Express Inc. v. McMahon*, 482 U.S. 220, 226, 107 S.Ct. 2332, 96 L.Ed.2d 185 (1987)).

"However, whether a party agreed to arbitration is a contract issue, meaning arbitration clauses are only valid if the parties intended to arbitrate." *Ragab*, 841 F.3d at 1137. "No party can be compelled to submit a dispute to arbitration without having previously agreed to so submit." *Id.* "Accordingly, the first task of a court asked to compel arbitration of a dispute is [typically] to determine whether the parties agreed to arbitrate that dispute." *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 626, 105 S.Ct. 3346, 87 L.Ed.2d 444 (1985). That is generally a matter of state law contract principles.[3] *Ragab*, 841 F.3d at 1137.

[3] Harrison argues that he did not agree to arbitrate his claims and that the SPD conflicts with the Plan Document regarding a claimant's right to file suit. The district court, however, did not address that argument in denying Defendants' motion to compel and, because we agree with the district court's disposition, we need not address the argument either.

*The effective vindication exception*

Also relevant to the validity of an arbitration agreement is what the Supreme Court has termed the " 'effective vindication' exception." *Am. Express Co. v. Italian Colors Restaurant*, 570 U.S. 228, 235, 133 S.Ct. 2304, 186 L.Ed.2d 417 (2013). This exception, which rests on public policy grounds, "finds its origin in the desire to prevent 'prospective waiver of a party's *right to pursue* statutory remedies.' " *Id.* at 236, 133 S.Ct. 2304 (quoting *Mitsubishi Motors Corp.*, 473 U.S. at 637 n.19, 105 S.Ct. 3346). The key question is whether "the prospective litigant effectively may vindicate its statutory cause of action in the arbitral forum." *Id.* at 235, 133 S.Ct. 2304 (internal quotation marks omitted). Thus, for example, "a provision in an arbitration agreement forbidding the assertion of certain statutory rights" would run afoul of, and be invalidated by, the effective vindication exception. *Id.* at 236, 133 S.Ct. 2304. The Supreme Court has also suggested that the existence of "filing and administrative fees attached to arbitration that are so high as to make access to the forum impracticable" might fall within the scope of the effective vindication exception. *Id.*

**\*5** Although the Supreme Court has repeatedly recognized the existence of the effective vindication exception, it has, to date, declined to actually apply the exception in any case before it. For example, in *CompuCredit*, the Supreme Court granted certiorari to "consider whether the Credit Repair Organizations Act (CROA or Act), 15 U.S.C. § 1679 *et seq.*, preclude[d] enforcement of an arbitration agreement in a lawsuit alleging violations of that Act." 565 U.S. at 96, 132 S.Ct. 665. The plaintiffs/respondents in the case were "individuals who applied for and received a[ ] ... credit card marketed by petitioner[/defendant] CompuCredit." *Id.* at 97, 132 S.Ct. 665. "In their applications," plaintiffs/respondents "agreed to be bound by a provision" that purported to require "[a]ny claim, dispute or controversy ... at any time arising from or relating to your Account, any transferred balances or this Agreement" to "be resolved by binding arbitration." *Id.* (internal quotation marks omitted). The plaintiffs/respondents "filed a class-action complaint against CompuCredit ... alleging ... violations of the CROA" arising out of CompuCredit's "allegedly misleading representation that the credit card could be used to rebuild poor credit and the[ ] assessment of multiple fees upon opening of the accounts, which greatly reduced the advertised credit limit." *Id.* CompuCredit moved to compel arbitration of the claims. The district court denied the motion to compel and the Ninth Circuit affirmed.

The Supreme Court began its review by noting that the CROA "regulates the practices of credit repair organizations," and that "[i]n its principal substantive provisions, the CROA prohibits certain practices, § 1679b, establishes certain requirements for contracts with consumers, § 1679d, and gives consumers a right to cancel, § 1679e." *Id.* at 98, 132

S.Ct. 665. The Court also noted that "[e]nforcement is achieved through the Act's provision of a private cause of action for violation, § 1679g, as well as through federal and state administrative enforcement, § 1679h." *Id*. In opposing arbitration, the plaintiffs/respondents "focus[ed] on the CROA's disclosure and nonwaiver provisions." *Id*. The disclosure provision requires credit repair organizations to provide consumers with a statement, prior to the execution of any contract, that reads, "You have a right to sue a credit repair organization that violates the Credit Repair Organization Act." *Id*. at 99, 132 S.Ct. 665 (internal quotation marks omitted).

Although the Ninth Circuit concluded that "[t]he disclosure provision gives consumers the 'right to sue,' which 'clearly involves the right to bring an action in a court of law,' " the Supreme Court rejected this reasoning. *Id*. (quoting *Greenwood v. CompuCredit Corp.*, 615 F.3d 1204, 1208 (9th Cir. 2010)). The Court explained:

> The flaw in this argument is its premise: that the disclosure provision provides consumers with a right to bring an action in a court of law. It does not. Rather, it imposes an obligation on credit repair organizations to supply consumers with a specific statement set forth (in quotation marks) in the statute. The only consumer right it *creates* is the right to receive the statement, which is meant to describe the consumer protections that the law *elsewhere* provides.

*Id*. (emphasis in original). The Court also rejected plaintiffs/respondents' arguments "that the CROA's civil-liability provision, § 1679g ..., demonstrates that the Act provides consumers with a 'right' to bring an action in court." *Id*. at 100, 132 S.Ct. 665. Although the Court acknowledged that § 1679g repeatedly uses "the terms 'action,' 'class action,' and 'court,' " the Court noted that "[i]t is utterly commonplace for statutes that create civil causes of action to describe the details of those causes of action, including the relief available, in the context of a court suit." *Id*. Lastly, the Court rejected plaintiffs/respondents' argument "that if the CROA does not create a right to a judicial forum, then the disclosure provision effectively requires that credit repair organizations mislead consumers." *Id*. at 102, 132 S.Ct. 665. The Court explained that "[t]he disclosure provision is meant to describe the law to consumers in a manner that is concise and comprehensible to the layman—which necessarily means that it will be imprecise." *Id*. The Court further explained that "with respect to the statement's description of a 'right to sue, ... [t]his is a colloquial method of communicating to consumers that they have the legal right, enforceable in a court, to recover damages from credit repair organizations that violate the CROA," and that "most consumers would understand it this way, without regard to whether the suit in court has to be preceded by an arbitration proceeding." *Id*. at 103, 132 S.Ct. 665.

**\*6** In *American Express*, the Supreme Court rejected a different argument that attempted to avoid arbitration. There, a group of merchants "brought a class action against" American Express and a wholly owned subsidiary "for violations of the federal antitrust laws." *Am. Exp. Co.*, 570 U.S. at 231, 133 S.Ct. 2304. The merchants alleged that "American Express used its monopoly power in the market for charge cards to force merchants to accept credit cards at rates approximately 30% higher than the fees for competing credit cards," and thereby "violated § 1 of the Sherman Act." *Id*. American Express "moved to compel individual arbitration under the" FAA, citing "a clause" in the agreement it entered into with the merchants "that require[d] all disputes between the parties to be resolved by arbitration." *Id*. "The agreement also provide[d] that '[t]here shall be no right or authority for any Claims to be arbitrated on a class action basis.' " *Id*. (quoting *In re Am. Express Merchants' Litig.*, 667 F.3d 204, 209 (2d Cir. 2012)). The district court granted American Express's motion to compel individual arbitration, but the Second Circuit "reversed and remanded for further proceedings," concluding that "the waiver was unenforceable" because the merchants "had established that they would incur prohibitive costs if compelled to arbitrate under the class action waiver." *Id*. at 232, 133 S.Ct. 2304 (internal quotation marks omitted).

The Supreme Court granted certiorari to consider "whether a contractual waiver of class arbitration [wa]s enforceable under the [FAA] when the plaintiff's cost of individually arbitrating a federal statutory claim exceed[ed] the potential recovery." *Id*. at 231, 133 S.Ct. 2304. In considering this question, the Court addressed the merchants' invocation of the effective vindication exception. The merchants argued that "[e]nforcing the waiver of class arbitration bar[red] effective vindication ... because," due to the prohibitive costs associated with

arbitrating their claims on an individual basis, "they ha[d] no economic incentive to pursue their antitrust claims individually in arbitration." *Id*. at 235, 133 S.Ct. 2304. The Supreme Court rejected this argument, noting that "the fact that it is not worth the expense involved in proving a statutory remedy does not constitute the elimination of the *right to pursue* that remedy." *Id*. at 236, 133 S.Ct. 2304 (emphasis in original). The Supreme Court emphasized that "[t]he class-action waiver merely limit[ed] arbitration to the two contracting parties," and did not "eliminate[ ] those parties' right to pursue their statutory remedy." *Id*. The Court also emphasized that statutory permission of collective actions does not necessarily bar "individual attempts at conciliation." *Id*. at 237, 133 S.Ct. 2304.

*Did the district court err in concluding that the effective vindication exception applies in this case?*

Defendants argue that the effective vindication exception does not apply in this case and that the district court erred in concluding otherwise. More specifically, Defendants argue that "the arbitration clause here does not foreclose the availability of all claims under ERISA." Aplt. Br. at 10. Defendants note in support that the Department of Labor (the DOL) "can file suit in federal court to seek plan-wide relief if appropriate and, of course, other participants in this Plan remain free to bring their own individual claims for financial relief in arbitration." *Id*. at 12. Thus, Defendants argue, "[e]nforcing individual arbitration, as this Plan requires, will not foreclose plan-wide relief," but instead "simply cabins the claims that can be arbitrated (as many arbitration provisions in other contexts do)." *Id*.

Harrison argues, in contrast, that the effective vindication exception applies because "[t]he arbitration provision here is a textbook example of a clause that impermissibly restricts remedies and abridges substantive rights." Aple. Br. at 17–18. He argues that the arbitration provision "explicitly forbids remedies that 29 U.S.C. § 1132(a)(2) and (a)(3) authorize." *Id*. at 18. More specifically, he notes that these provisions of "ERISA expressly authorize[ ] suits by participants for plan-wide relief, including injunctive relief and removal and replacement of plan fiduciaries." *Id*. He also notes that "claims under § 1132(a)(2) can *only* be brought in a representative capacity." *Id*. (emphasis in original). "Indeed," he asserts, "plan-wide remedies are the core purpose of claims under § 1132(a)(2)." *Id*. Yet, he argues, the arbitration clause at issue here "purports to bar participants from seeking relief that the statute allows them to pursue" because it bars "any claim brought in a 'representative capacity' and any remedy that 'has the purpose or effect of providing additional benefits or monetary or other relief to [anyone] other than the Claimant.' " *Id*.

*7 The DOL has filed an amicus brief in support of Harrison and argues that "ERISA sections 502(a)(2) and 409(a) authorize participants to bring an action to recover, among other things, 'any losses to the plan' resulting from a fiduciary breach, and to seek 'removal of such fiduciary.' " DOL Br. at 6 (quoting 29 U.S.C. §§ 1132(a)(2), 1109(a)). The DOL further notes that both the Supreme Court and this court "have recognized" that "claims under these sections are 'brought in a representative capacity on behalf of the plan as a whole.' " *Id*. (quoting *Mass. Mut. Life Ins. Co. v. Russell*, 473 U.S. 134, 142 n.9, 105 S.Ct. 3085, 87 L.Ed.2d 96 (1985)). "This is true," the DOL notes, "even in the context of defined contribution plans comprising individual participant accounts." *Id*. (citing *LaRue v. DeWolff, Boberg & Assocs., Inc.*, 552 U.S. 248, 256, 128 S.Ct. 1020, 169 L.Ed.2d 847 (2008)). "In short," the DOL argues, "a participant bringing a claim under section 502(a)(2) does so on the plan's behalf and thus may recover, for the plan's benefit, all losses sustained by the plan (among other forms of redress) stemming from the fiduciary breach." *Id*. The DOL asserts that Harrison "here sought precisely the remedies authorized by section 502(a)(2) to redress the overpayment he alleges Defendants caused the Plan, including all Plan losses and removal of Argent as Plan trustee." *Id*. at 7. "Yet," the DOL argues, "Defendants sought to force [Harrison] to abandon these statutory remedies by moving to compel arbitration under an agreement that restricts him to obtaining only individualized relief." *Id*.

To resolve these arguments and determine whether the effective vindication exception applies in this case, we must first identify the statutory remedies that Harrison is seeking in his complaint. We must then determine whether the arbitration provisions contained in the Plan Document effectively prevent Harrison from obtaining those statutory remedies in the arbitral forum. As we shall discuss, we conclude that the arbitration provisions of the Plan Document effectively prevent Harrison from vindicating many of the statutory

remedies that he seeks in his complaint under ERISA § 502(a)(2).

*a) The statutory remedies sought by Harrison in his complaint*

Harrison's complaint, in a section entitled "PLAINTIFF SEEKS PLAN-WIDE RELIEF," states, in pertinent part, that Harrison "brings these claims for plan-wide relief pursuant to ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2)." Aplt. App., Vol. I at 35. The complaint in turn alleges six specific causes of action and accompanying claims for relief.

Count I alleges that Argent and the ESOP Committee Defendants engaged in a "[p]rohibited [t]ransaction in [v]iolation of ERISA § 406(a), 29 U.S.C. § 1106(a)" by "caus[ing] the ESOP to purchase 100,000 shares of the Company from the Sellers" and "to borrow hundreds of millions of dollars from the Sellers." *Id*. at 40, 41, 42. Count I, in turn, alleges that "[t]he ESOP Committee Defendants and Argent are liable for appropriate relief under ERISA § 409, 29 U.S.C. § 1109, and ERISA § 502(a)(2) and (3), 29 U.S.C. § 1132(a)(2) and (3), for causing the prohibited transactions set forth herein." *Id*. at 42.

Count II alleges that the Seller Defendants, in their non-fiduciary capacities, engaged in a "[p]rohibited [t]ransaction in [v]iolation of ERISA § 406(a), 29 U.S.C. § 1106(a)" by arranging and carrying out the sale of their common stock to the ESOP, while continuing to maintain control of the company. *Id*. at 42. Count II, in turn, alleges, in pertinent part, that the Seller Defendants are "liable for appropriate equitable relief as nonfiduciary parties in interest, including the disgorgement of any ill-gotten gains they received." *Id*. at 43.

Count III alleges that Argent and the ESOP Committee Defendants breached their fiduciary duties under ERISA § 404(a)(1)(A) and (B), 29 U.S.C. § 1104(a)(1)(A) and (B), by failing to conduct "a prudent and loyal investigation of all the relevant ESOP Transaction terms, financial projections, and assumptions in connection with the ESOP Transaction," all of which "would have revealed that the price the ESOP paid was greater than fair market value of the Envision stock at the time of the Transaction," "that it was imprudent to approve the ESOP's purchase of Envision stock ... because th[e] share [purchase] prices did not adequately reflect the fact that the ESOP gained no control over the Company," "that the enormous debt burden taken on by the ESOP to complete the Transaction was imprudent," and "that the ESOP Transaction terms, taken together, were not in the best interest of the ESOP participants." *Id*. at 45. Count III, in turn, alleges that "[t]he ESOP Committee and Argent, as fiduciaries to the ESOP, are liable for appropriate relief under ERISA § 502(a)(2) and (3), 29 U.S.C. § 1132(a)(2) and (3), and ERISA § 409, 29 U.S.C. § 1109, for these violations." *Id*. at 46.

**\*8** Count IV of the complaint alleges that the Board Defendants violated ERISA § 404(a)(1)(A) and (B), 29 U.S.C. § 1104(a)(1)(A) and (B), by failing to monitor and evaluate the performance and fiduciary processes of Argent, failing to correct the fact that Argent was acting based on unrealistic and unreliable financial projections for Envision's future revenues, cash flows and earnings, failing to ensure that Argent conducted due diligence regarding the financial projections underlying the Envision stock valuation at the time of the Transaction, failing to ensure that ESOP participants did not pay an excess amount for the stock, failing to implement a system to avoid conflicts of interest, failing to remove Argent when they knew that its performance was inadequate, and failing to ensure that Argent took appropriate remedial action after the ESOP Transaction. *Id*. at 47–48. Count IV, in turn, alleges that the Board Defendants "are liable for appropriate relief under ERISA § 409, 29 U.S.C. § 1109, and ERISA § 502(a)(2) and (3), 29 U.S.C. § 1132(a)(2) and (3)." *Id*. at 48.

Count V alleges that the Board Defendants were, pursuant to ERISA § 405(a)(1) and (a)(3), 29 U.S.C. § 1105(a)(1) and (a)(3), "liable as co-fiduciaries for the ESOP's losses as a result of Argent's fiduciary violations." *Id*. at 49.

Count VI alleges that all of the Defendants violated ERISA §§ 410(a) and 502(a)(2) and (a)(3), 29 U.S.C. §§ 1110(a) and 1132(a)(2) and (a)(3), by (a) adopting terms of the ESOP Plan Document that purported to indemnify the ESOP Committee Defendants, Argent and all of its affiliates" for any costs or expenses associated with violating their fiduciary duties, and (b) entering into an agreement with Argent to indemnify Argent and its affiliates for any costs or expenses associated with violating their fiduciary duties. *Id*. at 49–50. Count VI, in turn, alleges that "[t]his attempt to relieve Defendants of their liability for losses caused by their fiduciary violations is

Case 3:20-cv-01358-E   Document 124-1   Filed 05/15/23   Page 9 of 17   PageID 1624

Harrison v. Envision Management Holding, Inc. Board of Directors, --- F.4th ---- (2023)

void as against public policy and should be declared as such pursuant to ERISA § 502(a)(2) and (a)(3), 29 U.S.C. § 1132(a)(2) and (a)(3). *Id*. at 50.

Lastly, the complaint's "PRAYER FOR RELIEF" section asks the district court, in pertinent part, to (a) declare that all Defendants "breached their fiduciary duties under ERISA," (b) enjoin all Defendants from further violations of their fiduciary duties, (c) remove Argent as the Trustee of the Envision ESOP or bar it from serving as a fiduciary of the ESOP in the future, (d) appoint a new independent fiduciary to manage the Envision ESOP and order the costs of such independent fiduciary to be paid for by defendants, (e) order Argent to restore all the losses resulting from the fiduciary breaches and to disgorge all profits made through use of assets of the ESOP, and (f) order Defendants to provide other appropriate equitable relief to the ESOP, including disgorgement of profits. *Id*. at 51.

In sum, Harrison's complaint in general, and four of the six causes of action in particular, seek relief under ERISA §§ 502(a)(2) and (a)(3), 29 U.S.C. §§ 1132(a)(2) and (a)(3). These two subsections of ERISA provide as follows:

A civil action may be brought—

* * *

(2) by the Secretary, or by a participant, beneficiary or fiduciary for appropriate relief under section 1109 of this title;

(3) by a participant, beneficiary, or fiduciary (A) to enjoin any act or practice which violates any provision of this subchapter or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of this subchapter or the terms of the plan ....

29 U.S.C. §§ 1132(a)(2), (a)(3).

Section 1109, which is expressly referenced in § 1132(a)(2), and which is also cited by Harrison in his complaint, is entitled "Liability for breach of fiduciary duty," and provides as follows:

(a) Any person who is a fiduciary with respect to a plan who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries by this subchapter shall be personally liable to make good to such plan any losses to the plan resulting from each such breach, and to restore to such plan any profits of such fiduciary which have been made through use of assets of the plan by the fiduciary, and shall be subject to such other equitable or remedial relief as the court may deem appropriate, including removal of such fiduciary. A fiduciary may also be removed for a violation of section 1111 of this title.

**\*9** (b) No fiduciary shall be liable with respect to a breach of fiduciary duty under this subchapter if such breach was committed before he became a fiduciary or after he ceased to be a fiduciary.

29 U.S.C. § 1109. As the Seventh Circuit has noted, "[t]aken together, § 1109(a) creates fiduciary liability, and § 1132(a)(2) allows for its enforcement." *Smith*, 13 F.4th at 618.

Notably, the Supreme Court has "examined these [statutory] provisions" in the context of both a defined benefit plan (e.g., a pension plan) and a defined contribution plan (e.g., a 401(k) plan). *Id*. In the defined benefit plan case, *Russell*, a participant "sued a fiduciary under § 1132(a) 'for extra-contractual compensatory or punitive damages caused by improper or untimely processing' of her plan benefit claims, in violation of § 1109(a)." *Id*. (citing *Russell*, 473 U.S. at 136, 105 S.Ct. 3085). "The [Supreme] Court held that § 1132(a) precluded such individualized relief." *Id*. (citing *Russell*, 473 U.S. at 139-44, 105 S.Ct. 3085). "Recovery under § 1132(a) for a violation of § 1109, the Court explained, benefits the whole defined benefit plan." *Id*. (citing *Russell*, 473 U.S. at 140, 105 S.Ct. 3085). "This was because the 'principal statutory duties' under § 1109(a) are those that 'relate to the proper management, administration, and investment of fund assets, the maintenance of proper records, the disclosure of specified information, and the avoidance of conflicts of interest.' " *Id*. (quoting *Russell*, 473 U.S. at 143–44, 105 S.Ct. 3085). "In addition, '[a] fair contextual reading of the statute ma[de] it abundantly clear that its draftsmen were primarily concerned with the possible misuse of plan assets, and with remedies that would protect the entire plan, rather than with the rights of an individual beneficiary.' " *Id*. (quoting *Russell*, 473 U.S. at 144, 105 S.Ct. 3085). "So for the Court, 'the entire text of § [1109] persuade[d] [it] that Congress did not intend that section to authorize any relief except for the plan itself.'

" *Id.* (quoting *Russell*, 473 U.S. at 142, 105 S.Ct. 3085). "Because the plan participant alleged an individualized, and not plan-wide, harm, § 1132(a) provided no viable cause of action." *Id.* at 618–19.

In the defined contribution plan case, *LaRue*, "a plan participant alleged that a fiduciary's misconduct—failing to make certain changes to his 401(k) account—had ' "depleted" his interest in the [defined contribution plan] by approximately $150,000, and amounted to a breach of fiduciary duty under ERISA.' " *Id.* at 619 (quoting *LaRue*, 552 U.S. at 251, 128 S.Ct. 1020). "The [Supreme] Court held that § 1132(a) permitted such individualized relief, distinguishing *Russell* in the process." *Id.* (citing *LaRue*, 552 U.S. at 253–56, 128 S.Ct. 1020). " 'Unlike the defined contribution plan' in *LaRue*, 'the disability plan at issue in *Russell* did not have individual accounts; it paid a fixed benefit based on a percentage of the employee's salary.' " *Id.* (quoting *LaRue*, 552 U.S. at 255, 128 S.Ct. 1020). "And so '[t]he "entire plan" language in *Russell*,' the Court noted, 'speaks to the impact of § 409 on plans that pay defined benefits.' " *Id.* (quoting *LaRue*, 552 U.S. at 255, 128 S.Ct. 1020). "Put another way, '*Russell*'s emphasis on protecting the "entire plan" from fiduciary misconduct reflects the former landscape of employee benefit plans. That landscape has changed.' " *Id.* (quoting *LaRue*, 552 U.S. at 254, 128 S.Ct. 1020). "The difference between a defined benefit plan and a defined contribution plan was dispositive in *LaRue*." *Id.* at 254–55, 128 S.Ct. 1020. "As the [Supreme] Court explained, '[m]isconduct by the administrators of a defined benefit plan will not affect an individual's entitlement to a defined benefit unless it creates or enhances the risk of default by the entire plan.' " *Id.* (quoting *LaRue*, 552 U.S. at 255, 128 S.Ct. 1020). "But '[f]or defined contribution plans,' misconduct by a fiduciary 'need not threaten the solvency of the entire plan to reduce benefits below the amount that participants would otherwise receive.' " *Id.* (quoting *LaRue*, 552 U.S. at 255–56, 128 S.Ct. 1020). "The defined contribution plan participant in *LaRue*—unlike the defined benefit plan participant *Russell*—alleged fiduciary misconduct that fell 'squarely within' § 1109, so the Court permitted his claim under § 1132(a)." *Id.* (quoting *LaRue*, 552 U.S. at 253, 128 S.Ct. 1020). "With *Russell* cabined to defined benefit plans, *LaRue* concluded 'that although § [1132(a)] does not provide a remedy for individual injuries distinct from plan injuries, that provision does authorize recovery for fiduciary breaches that impair the value of plan assets in a participant's individual account.' " *Id.* (quoting *LaRue*, 552 U.S. at 256, 128 S.Ct. 1020).

*b) Does the arbitration provision prevent Harrison from obtaining the statutory remedies identified in his complaint?*

**\*10** Having outlined the statutory remedies that Harrison seeks in his complaint, the question then becomes whether the arbitration provisions contained in the Plan Document effectively prevent Harrison from vindicating those statutory remedies. Section 21 of the Plan Document is entitled "ERISA ARBITRATION AND CLASS ACTION WAIVER." Aplt. App., Vol. I at 118. Section 21 provides, in pertinent part, as follows:

21.1 <u>Arbitration Requirement and Procedure</u>. *Subject to and without waiver of full compliance with the Plan's claims procedures as described in Section 14 which, to the extent applicable, must be exhausted with respect to any claim before any arbitration pursuant to this Section 21, all Covered Claims must be resolved exclusively pursuant to the provisions of this Section 21* (the "Arbitration Procedure").

(a) <u>Covered Claims</u>. *Any claim made by or on behalf of an Eligible Employee, Participant or Beneficiary (a "Claimant") which arises out of, relates to, or concerns this Plan, the Trust Agreement, or the Trust, including without limitation, any claim for benefits under the Plan, Trust Agreement, or Trust; any claim asserting a breach of, or failure to follow, the Plan or Trust; and any claim asserting a breach of, or failure to follow, any provision of ERISA or the Code, including without limitation claims for breach of fiduciary duty, ERISA § 510 claims, and claims for failure to timely provide notices or information required by ERISA or the Code (collectively, "Covered Claims"), shall be resolved exclusively by binding arbitration administered in accordance with the National Rules for the Resolution of Employment Disputes (the "Rules") of the American Arbitration Association ("AAA") then in effect.* \* \* \*

(b) <u>No Group, Class, or Representative Arbitrations</u>. *All Covered Claims must be brought solely in the Claimant's individual capacity and not in a representative capacity or on a class, collective, or group basis. Each arbitration*

shall be limited solely to one Claimant's Covered Claims, and that Claimant may not seek or receive any remedy which has the purpose or effect of providing additional benefits or monetary or other relief to any Eligible employee, Participant or Beneficiary other than the Claimant. For instance, with respect to any claim brought under ERISA § 502(a)(2) to seek appropriate relief under ERISA § 409, the Claimant's remedy, if any, shall be limited to (i) the alleged losses to the Claimant's individual Account resulting from the alleged breach of fiduciary duty, (ii) a pro-rated portion of any profits allegedly made by a fiduciary through the use of Plan assets where such pro-rated amount is intended to provide a remedy solely to Claimant's individual Account, and/or (iii) such other remedial or equitable relief as the arbitrator(s) deems proper so long as such remedial or equitable relief does not include or result in the provision of additional benefits or monetary relief to any Eligible Employee, Participant or Beneficiary other than the Claimant, and is not binding on the Plan Administrator or Trustee with respect to any Eligible Employee, Participant or Beneficiary other than the Claimant. *The requirement that (x) all Covered Claims be brought solely in a Claimant's individual capacity and not in a purported group, class, collective, or representative capacity, and (y) that no Claimant shall be entitled to receive, and shall not be awarded, any relief other than individual relief, shall govern irrespective of any AAA rule or decision to the contrary and is a material and non-severable term of this Section 21.* The arbitrator(s) shall consequently have no jurisdiction or authority to compel or permit any class, collective, or representative action in arbitration, to consolidate different arbitration proceedings, or to join any other party to any arbitration. Any dispute or issue as to the applicability or validity of this Section 21(b) (the "Class Action Waiver") shall be determined by a court of competent jurisdiction. * * * *In the event a court of competent jurisdiction were to find these requirements to be unenforceable or invalid, then the entire Arbitration Procedure (i.e., all of this Section 14) shall be rendered null and void in all respects.*

**\*11** * * *

(l) Covered Claims Against Non-Fiduciaries. *This Arbitration Procedure shall apply to all Covered Claims asserted by a Claimant, whether such Covered Claims are asserted solely against one or more of the Plan's fiduciaries or are also asserted against the Primary Sponsor or any other non-fiduciary (e.g., a Plan service provider).*

*Id*. at 118–21 (emphasis added).

Section 21 of the Plan Document clearly encompasses the claims asserted by Harrison in his complaint. That is because the claims asserted by Harrison satisfy the definition of "Covered Claims" contained in Section 21(a). Specifically, Harrison was a "Participant" of the Plan and is asserting claims "asserting a breach of, or failure to follow, the Plan," as well as claims "asserting a breach of, or failure to follow, any provision of ERISA ..., including ... claims for breach of fiduciary duty." *Id*. at 118. Section 21(a) provides that these claims "shall be resolved exclusively by binding arbitration." *Id*.

The first sentence of Section 21(b) in turn provides that "[a]ll Covered Claims," including those asserted by Harrison in his complaint, "must be brought solely in the Claimant's individual capacity and not in a representative capacity or on a class, collective, or group basis." *Id*. at 119. The prohibition on class or collective actions, in our view, is not cause for invoking the effective vindication exception. Indeed, as the Seventh Circuit has noted, the Supreme "Court has blessed that arbitration maneuver many times, including under the National Labor Relations Act." *Smith*, 13 F.4th at 622. But the prohibition on a claimant proceeding in a representative capacity is potentially more problematic, at least where, as here, the claimant alleges that the named defendants violated fiduciary duties that resulted in plan-wide harm and not just harm to the claimant's own account and the claimant seeks relief under § 1132(a)(2). As the Sixth Circuit recently concluded, "[t]he weight of authority suggests that [such] claims should be thought of as Plan claims, not [the plaintiff's] claims."[4] *Hawkins v. Cintas Corp.*, 32 F.4th 625, 635 (6th Cir. 2022). If the Sixth Circuit is correct on that point, then Section 21(b)'s prohibition on a claimant proceeding in a representative capacity is inconsistent with, and prevents a claimant from effectively vindicating the remedies afforded by, § 1132(a)(2). We ultimately do not need to decide that question because, as we shall proceed to discuss, the second sentence of Section 21(b) prevents Harrison from effectively vindicating the statutory remedies cited in his complaint.

| 4 | As the Sixth Circuit noted in *Hawkins*, "*LaRue* does not ... specifically hold that a § 502(a)(2) claim 'belongs' to either the plaintiff or the plan itself." 32 F.4th at 631. The Sixth Circuit therefore looked to other case law to decide that question. |
|---|---|

The second sentence of Section 21(b) states that "[e]ach arbitration shall be limited solely to one Claimant's Covered Claims, *and that Claimant may not seek or receive any remedy which has the purpose or effect of providing additional benefits or monetary or other relief to any Eligible employee, Participant or Beneficiary other than the Claimant.*" Aplt. App., Vol. I at 119 (emphasis added). The emphasized portion of this sentence would clearly prevent Harrison from obtaining at least some of the forms of relief that he seeks in his complaint pursuant to § 1132(a)(2), including (a) the imposition of liability on the ESOP Committee Defendants and Argent for losses suffered by the Plan generally, (b) a declaration that all Defendants breached their fiduciary duties under ERISA, (c) a declaration that the terms of the ESOP Plan Document that purported to indemnify the ESOP Committee Defendants, Argent, and Argent's affiliates are void as against public policy, (d) an order enjoining all Defendants from further violating their fiduciary duties, (e) an order removing Argent as the Trustee, (f) an order appointing a new independent fiduciary to manage the Envision ESOP and directing Defendants to pay the costs of such independent fiduciary, and (g) an order directing Argent to restore all the losses resulting from the fiduciary breaches and to disgorge all profits made through use of assets of the ESOP. That is because all of these forms of relief would clearly "ha[ve] the purpose or effect of providing additional benefits or monetary or other relief to" all of the Plan participants and beneficiaries and would thus be barred by the second sentence of Section 21(b) of the Plan Document.

**\*12** Indeed, this conclusion is confirmed by the third sentence of Section 21(b): "*For instance, with respect to any claim brought under ERISA § 502(a)(2) to seek appropriate relief under ERISA § 409, the Claimant's remedy, if any, shall be limited to (i) the alleged losses to the Claimant's individual Account resulting from the alleged breach of fiduciary duty, (ii) a pro-rated portion of any profits allegedly made by a fiduciary through the use of Plan assets where such pro-rated amount is intended to provide a remedy solely to Claimant's individual Account, and/or (iii) such other remedial or equitable relief as the arbitrator(s) deems proper so long as such remedial or equitable relief does not include or result in the provision of additional benefits or monetary relief to any Eligible Employee, Participant or Beneficiary other than the Claimant, and is not binding on the Plan Administrator or Trustee with respect to any Eligible Employee, Participant or Beneficiary other than the Claimant.*" *Id.* (emphasis added). As noted, many of Harrison's claims are brought under § 1132(a)(2) and seek forms of relief that would benefit the Plan as a whole, rather than Harrison individually. Section 21(b), however, is written in a manner intended to foreclose any such plan-wide relief. In other words, Section 21(b) is not problematic because it requires Harrison to arbitrate his claims, but rather because it purports to foreclose a number of remedies that were specifically authorized by Congress in the ERISA provisions cited by Harrison. Because Section 21(b), if enforced, would prevent Harrison from vindicating in the required arbitral forum the statutory causes of action listed in his complaint, we conclude that the effective vindication exception applies in this case. Indeed, it is not clear what remedies Harrison would be left with if Section 21(b) is enforced as written. And, in fact, Section 21(b) effectively prevents any claimant from pursuing the types of claims that Harrison asserts in his complaint.[5]

| 5 | Defendants suggest in their opening appellate brief that "each participant" may "pursue the losses to his or her individual account" by way of arbitration. Aplt. Br. at 35 n. 7. Even assuming that is true, the arbitration provisions in the Plan Document nevertheless prohibit the various forms of equitable relief sought by Harrison in his complaint, including (a) the imposition of liability on the ESOP Committee Defendants and Argent for losses suffered by the Plan generally, (b) a declaration that all the defendants breached their fiduciary duties under ERISA, (c) a declaration that the terms of the ESOP Plan Document that purported to indemnify the ESOP Committee Defendants, Argent, and Argent's affiliates are void as against public policy, (d) an order enjoining all defendants from further violating their fiduciary duties, (e) an order removing Argent as the Trustee, (f) an order appointing a new independent fiduciary to manage the Envision ESOP and directing defendants to pay the costs of |
|---|---|

such independent fiduciary, and (g) an order directing Argent to restore all the losses resulting from the fiduciary breaches and to disgorge all profits made through use of assets of the ESOP.

This conclusion is supported by the Seventh Circuit's decision in *Smith*. Notably, *Smith* involved strikingly similar underlying facts and claims. The plaintiff in the case, James Smith, "worked for Triad Manufacturing, Inc." for one year and "participated in Triad's Employee Stock Ownership Plan, a defined contribution employee retirement plan under" ERISA. 13 F.4th at 615. Triad's three shareholder-directors sold all of Triad's stock to the plan for a price of $58.05 per share and in turn appointed GreatBanc Trust Company as the plan trustee. The plan financed the purchase "through loans provided by the three [shareholder-directors]." *Id.* at 616. GreatBanc approved the transaction, "seemingly after it had already occurred." *Id.* The transaction resulted in the plan's holdings "consist[ing] entirely of Triad stock." *Id.* Approximately two weeks after the transaction, Triad's "share price ... dropped to $1.85," causing the plan's holdings to "plummet[ ] in two weeks" from "over $106 million ... to just under $4 million." *Id.* Notwithstanding the drop in stock value, the plan was required, under the terms of the stock purchase transaction, "to make retirement contributions in amounts no less than necessary to service the loan payments" to the three shareholder-directors. *Id.* Approximately six months later, Triad's board, which served as the plan's primary sponsor, "amended the plan to include an arbitration provision with a class action waiver." *Id.* One section of the arbitration provision required covered claims to be brought solely in the claimant's individual capacity and not in a representative capacity, and also prohibited any claimant from seeking or receiving any remedy which had the purpose or effect of providing additional benefits or monetary or other relief to anyone other than the claimant.

**\*13** Smith subsequently filed a class action complaint against the three shareholder-directors and GreatBanc under 29 U.S.C. § 1132(a)(2) and (a)(3). In his complaint, Smith alleged that the shareholder-directors (a) "breached their fiduciary duties by failing to monitor fellow fiduciary GreatBanc as plan trustee," (b) "engaged in prohibited transactions in violation of 29 U.S.C. § 1106(a)," and (c) "knowingly participated in GreatBanc's fiduciary violations." *Id.* at 617. In terms of relief, Smith's complaint sought the removal of GreatBanc as trustee, the appointment of a new independent fiduciary, an order directing defendants to pay for the appointment of a new fiduciary, and other available forms of relief under § 1132(a)(2).

The shareholder-director defendants moved to compel arbitration or, alternatively, to dismiss Smith's claims. The district court denied that motion concluding, in pertinent part, that the arbitration provision was "unenforceable because it prospectively waived Smith's right to statutory remedies provided by ERISA." *Id.* The shareholder-director defendants then appealed to the Seventh Circuit.

The Seventh Circuit concluded, as a threshold matter, "that ERISA claims are generally arbitrable." *Id.* at 620. But the Seventh Circuit concluded that the arbitration provision in Smith's case was not enforceable because "the plain text of § 1109(a) and the terms of the arbitration provision [could not] be reconciled: what the statute permits, the plan precludes." *Id.* at 621. The Seventh Circuit emphasized that "the problem with the plan's arbitration provision [wa]s its prohibition on certain plan-wide remedies, not plan-wide representation." *Id.*

As we have discussed, the same is true with respect to Section 21 of the Plan Document in Harrison's case. It is not Section 21's prohibition on class actions that is problematic. Rather, it is Section 21's prohibition of any form of relief that would benefit anyone other than Harrison that directly conflicts with the statutory remedies available under 29 U.S.C. §§ 1109 and 1132(a)(2), (a)(3).

*c) Defendants' remaining arguments*

Defendants make several other arguments in challenging the district court's denial of their motion to compel arbitration. To begin with, Defendants argue that the district court's order "violates a core tenet of ERISA, which requires that a plan document be enforced strictly according to its terms." Aplt. Br. at 24. Defendants note in support that "ERISA flatly requires that '[e]very employee benefit plan shall be established and maintained pursuant to a written instrument.'" *Id.* (quoting 29 U.S.C. § 1102(a)(1)). Defendants also note that "any fiduciary of an ERISA plan is obligated to act 'in accordance with the documents and instruments governing the plan insofar as such documents and instruments are consistent with [other parts of ERISA].'" *Id.* (quoting 29 U.S.C. §

1104(a)(1)(D)). These arguments, however, not only ignore, but fly directly in the face of, the effective vindication exception. Nothing in ERISA states that a plan document can override statutory remedies that were afforded to claimants by Congress. Further, as the DOL points out in its amicus brief, one of the ERISA sections that Defendants cite in support of their argument, § 1104(a)(1)(D), expressly states that fiduciaries are obligated to discharge their duties in accordance with the plan documents and instruments only to the extent that those documents and instruments " 'are consistent with the provisions of [Title I of ERISA].' " DOL Amicus Br. at 27 (quoting 29 U.S.C. § 1104(a)(1)(D)). "Enforcing a plan provision that waives a participant's right to seek plan-wide relief from a breaching fiduciary is inconsistent with the right to such relief conferred by sections 502(a)(2) and 409(a)," and thus "undermines Defendants' position and militates in favor of finding the Plan's Remedy Limitation invalid." *Id.*

**\*14** Defendants next argue that the district court, "[i]n finding that the individualized arbitration provision violates the 'effective vindication' exception, ... essentially concluded that an ERISA plan participant can never arbitrate an individual claim, because he can never waive the ERISA provision allowing for plan-wide remedies." Aplt. Br. at 28. That is incorrect for two related reasons. First, a review of Harrison's complaint establishes that most of his claims are not unique to himself, but instead concern Defendants' actions with respect to the Plan as a whole. Second, Harrison's complaint not only cites to ERISA provisions that allow for plan-wide remedies, but also specifically (and understandably, given the nature of his claims) requests such remedies. Thus, it would not be enough for an ERISA complainant to simply cite to the same statutory provisions that Harrison cites in his complaint. Instead, both the nature of the claims and the specific relief sought by the complainant matter. Thus, an ERISA complainant who is asserting a claim unique to himself or herself could not, simply by citing to the same ERISA provisions cited by Harrison, avoid arbitration in reliance on the effective vindication exception.

Defendants also argue that the Supreme Court's decision in *Epic Systems Corp. v. Lewis*, ––– U.S. ––––, 138 S. Ct. 1612, 200 L.Ed.2d 889 (2018), requires a clearly expressed congressional intention to override the FAA and forbid arbitration. Aplt. Br. at 29. *Epic*, however, did not involve the effective vindication exception. Instead, it involved an alleged conflict between the FAA and the National Labor Relations Act (the NLRA). The plaintiffs in *Epic*, despite entering into agreements with their employers that provided they would arbitrate any disputes that might arise between them, argued that the agreements "violate[d] the NLRA by barring employees from engaging in the 'concerted activity' of pursuing claims as a class or collective action."[6] 138 S. Ct. at 1620 (quoting 29 U.S.C. § 157). In rejecting the plaintiffs' arguments, the Supreme Court noted, in pertinent part, that "[w]hen confronted with two Acts of Congress allegedly touching on the same topic, [it] [wa]s not at liberty to pick and choose among congressional enactments and must instead strive to give effect to both." *Id.* at 1624 (internal quotation marks omitted). And, abiding by this principle, the Court refused "to infer a clear and manifest congressional command to displace the [FAA] and outlaw agreements like" those the plaintiffs entered into. *Id.* at 1624

[6] Notably, the arbitration agreements that plaintiffs entered into stated, in pertinent part, "that the arbitrator could 'grant any relief that could be granted by ... a court' in the relevant jurisdiction." 138 S. Ct. at 1619. Thus, the arbitration agreements differed in a key respect from the arbitration provision of the Plan here, which, as noted, effectively eliminated specific forms of statutory relief that had otherwise been authorized by Congress.

*Epic*, in short, is inapposite because it involved an argument by the party opposing arbitration that a different federal statute, i.e., the NLRA, conflicted with and effectively overrode the FAA. That is not the argument that Harrison (or the DOL) is making here. Specifically, Harrison is not arguing that the FAA and ERISA conflict in any way. Rather, he is arguing that the specific provisions of the arbitration section of the Plan effectively prevent him from vindicating statutory remedies that are outlined in ERISA.

That said, there is language in *Epic* that has some relevance to the case at hand. In discussing the FAA, the Supreme Court noted that the FAA "seems to protect pretty absolutely" contracts for arbitration that "specify the rules that w[ill] govern the[ ] arbitration," including any provisions that require the "use [of] individualized rather than class or collective action procedures." *Id.* at 1621. As noted, the

arbitration provisions of the Plan Document in this case specify the rules that will govern arbitration and clearly indicate that there will be only individualized rather than class or collective action *procedures*. Those procedural provisions, standing alone, do not appear to implicate the effective vindication exception and, instead, are protected by the FAA. Instead, as discussed above, it is the portion of Section 21(b) that purports to prohibit a claimant from obtaining any form of relief that would benefit anyone other than himself or herself that is problematic and that implicates the effective vindication exception. In other words, the Supreme Court's rulings regarding the effective vindication exception, including its statements in *Epic*, make clear that the exception is not implicated simply because an arbitration agreement changes, or even eliminates, the otherwise applicable procedures that a claimant may use to seek relief. Instead, the effective vindication exception applies only where an arbitration agreement alters or effectively eliminates substantive forms of relief that are afforded to a claimant by statute. And that is precisely what occurred here.

**\*15** Defendants also argue that "ERISA contains no clearly expressed congressional intent to prohibit individual arbitrations." Aplt. Br. at 31. That is true. But this argument misses the key point. It is not the Plan Document's requirement that a claimant engage in the procedural mechanism of individual arbitration that is the problem here. Rather, it is the Plan's prohibition on an individual claimant seeking any form of relief that would benefit anyone other than the claimant.

Relatedly, defendants suggest that "[e]ven construing" ERISA §§ 1132(a)(2) and 1109 "to *allow* participants to obtain plan-wide relief does not prove that plan-wide remedies could not be *waived*." *Id*. at 33 (emphasis in original). In support, defendants argue that "[w]ith respect to other federal statutes that provide a 'right' to collective litigation, an unbroken line of Supreme Court cases permits plaintiffs to waive the right to proceed class-wide by agreeing to individualized arbitration." *Id*. at 34. Defendants are again mistaken. To begin with, §§ 1132(a)(2) and 1109 allow claimants to obtain certain forms of plan-wide relief. Indeed, the Supreme Court has made clear that § 1132(a) does not provide a remedy for individual injuries distinct from plan injuries.[7] *LaRue*, 552 U.S. at 256, 128 S.Ct. 1020. As for the purported "unbroken line of Supreme Court cases" to which defendants refer, those cases simply confirm what is discussed above, i.e., that an arbitration agreement can alter or eliminate *procedures* (including eliminating class-wide arbitration) but cannot alter or eliminate *forms of relief* that are provided for by statute. For example, in *Gilmer v. Interstate/Johnson Lane Corp.*, 500 U.S. 20, 111 S.Ct. 1647, 114 L.Ed.2d 26 (1991), the Supreme Court addressed the question of "whether a claim under the Age Discrimination in Employment Act of 1967 (ADEA) ... can be subjected to compulsory arbitration pursuant to an arbitration agreement in a securities registration application." *Id*. at 23, 111 S.Ct. 1647. The plaintiff in the case argued, in pertinent part, "that arbitration procedures cannot adequately further the purposes of the ADEA because they do not provide for broad equitable relief and class actions." *Id*. at 32, 111 S.Ct. 1647. The Supreme Court disagreed, noting that "arbitrators do have the power to fashion equitable relief." *Id*. The Court also emphasized that the arbitration agreement at issue did "not restrict the types of relief an arbitrator may award, but merely refer[red] to 'damages/and/or other relief.' " *Id*. Notably, the case at hand differs significantly from the agreement at issue in *Gilmer* because, in the case at hand, the arbitration provisions in the Plan Document effectively restrict the types of relief the arbitrator may award.

[7] As the Sixth Circuit noted in *Hawkins*, "*Larue* ... means that while any claims properly brought under § 502(a)(2) must be for injuries to the plan itself, § 502(a)(2) authorizes suits on behalf of a defined-contribution plan even if the harm is inherently individualized." 32 F.4th at 631.

Lastly, Defendants assert for the first time on appeal that "ERISA specifically authorizes the Secretary of Labor to bring actions on behalf of a plan to recover plan-wide relief," and they argue that, notwithstanding the arbitration provisions of the Plan, "[t]he DOL can investigate and seek to remedy any broader breach, should it determine one has occurred, and other participants may further their own rights." Aplt. Br. at 46. It is true that § 1132(a)(2) authorizes the DOL, as well as plan participants (and beneficiaries and fiduciaries), to file suit and obtain the forms of relief outlined therein. Regardless of who brings suit under § 1132(a)(2), however, the fact remains, as the Supreme Court has made clear, that the suit is "on behalf of [the] plan" itself, and the precise same statutory remedies are available regardless of the named plaintiff.[8] *LaRue*, 552 U.S. at 253, 128 S.Ct. 1020. Moreover, nothing in the statute requires the Secretary of the DOL to file any such

suit, and it is unreasonable to assume that the DOL is capable of policing every employer-sponsored benefit plan in the country. Indeed, the DOL notes in its amicus brief that "there could be a host of reasons preventing the Secretary from bringing even the most meritorious of claims," including its limited resources. DOL Amicus Br. at 25. Thus, it remains true that Section 21 of the Plan, by prohibiting a claimant such as Harrison from obtaining any form of relief that would benefit anyone other than himself, prevents the effective vindication of the statutory remedies outlined in § 1132(a)(2). In other words, the effect of Section 21 of the Plan, if enforced, would be that participant/claimants such as Harrison would be left without any guarantee that a suit seeking the statutory remedies set forth in § 1132(a)(2) would ever be filed by the DOL (and, in turn, that those statutory remedies would ever be available).

8   It is of course possible that, as was the case in *LaRue*, the harm to a defined contribution plan is individualized, i.e., occurring just to an individual account within the defined contribution plan.

*The effect of the non-severability clause in Section 21.1(b)*

**\*16** As quoted above, Section 21.1(b) of the Plan Document includes a non-severability clause that reads as follows: "In the event a court of competent jurisdiction were to find these requirements to be unenforceable or invalid, then the entire Arbitration Procedure ... shall be rendered null and void in all respects." Aplt. App., Vol. I at 119.

Because we agree with the district court that the remedies limitation contained in Section 21.1(b) prevents Harrison from effectively vindicating his statutory remedies, that means that the entire Arbitration Procedure outlined in Section 21 of the Plan is "rendered null and void in all respects." In other words, Defendants are precluded from arguing that Harrison is required to submit his claims to arbitration without the remedy limitations outlined in Section 21.1(b).

### III

The decision of the district court is AFFIRMED.

**All Citations**

--- F.4th ----, 2023 WL 1830446

**End of Document**

© 2023 Thomson Reuters. No claim to original U.S. Government Works.